**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

ANGALA GARLAND, individually and
on behalf of all others similarly situated,

      Plaintiff,

v.

THE CHILDREN'S PLACE, INC.

      Defendant.

CLASS ACTION

CASE NO. 1:23-cv-4899

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff hereby files this Complaint on behalf of herself and all other similarly situated consumers against Defendant The Children's Place, Inc. (hereinafter, "The Children's Place") and complains and alleges as follows upon personal knowledge as to herself and her own acts and experiences and, as to all other matters, upon information and belief, including investigation conducted by her attorneys.

## INTRODUCTION

1.     This is a civil class action brought on behalf of all persons who have purchased school uniforms designed, manufactured, promoted, and sold by Defendant The Children's Place (hereinafter, the "School Uniforms"), which are marketed and sold to parents of school-aged children for wear in public and private schools throughout the United States and Illinois. Plaintiff seeks damages and equitable remedies for herself and for the putative Class.

2.     Plaintiff Angala Garland is the mother of Minor Child A, a minor.

3.     Defendant The Children's Place designs, manufactures, markets, advertises,

1

distributes, and sells the School Uniforms to consumers throughout the United States, including in this District. Defendant's products are sold in brick-and-mortar The Children's Place stores and online through The Children's Place's official website[1] and official Amazon storefront.[2]

4. The School Uniforms are marketed to parents of school-age children and intended to be worn by school-aged children for upwards of eight hours per day, five days per week. They contain harmful chemicals, including multiple polyfluoroalkyl substances ("PFAS"), which are a known safety hazard to children and to the environment.

5. Plaintiff's independent, industry-standard testing has confirmed the existence of these harmful chemicals in Defendant's School Uniforms.

6. The young children who wear Defendant's School Uniforms are uniquely vulnerable and susceptible to the adverse health incomes associated with PFAS due to their low body weight, sensitive development, prolonged periods of wear during the school week, and direct oral exposure due to frequent hand-to-mouth behaviors. The levels of PFAS in the School Uniforms pose a greater body burden and higher health dangers to children than to adults exposed to the same levels of PFAS.

7. Defendant has knowingly and willfully concealed the true, unsafe nature of its School Uniforms to consumers.

8. Defendant's misbranding and omission of material facts concerning the true, unsafe nature of their School Uniforms was intentional, and it renders the School Uniforms worthless or less valuable.

---

[1] Available at https://www.childrensplace.com/us.
[2] Available at www.Amazon.com/TheChildrensPlace.

9.      If Defendant had disclosed to Plaintiff and Class Members that the School Uniforms contained PFAS, Plaintiff and the Class Members would not have purchased the School Uniforms.  Plaintiff instead would either purchase other school uniforms that are free from PFAS or would have paid less for the School Uniforms at issue.

10.      As a result of Defendant's misconduct as alleged herein, Plaintiffs and the Class Members have suffered economic damages.

## PARTIES

### I.  Plaintiff

11.      Plaintiff Angala Garland and her child, Minor Child A, are citizens and residents of Chicago, Illinois.  Plaintiff is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff purchased School Uniforms containing PFAS in 2022 from The Children's Place online store, which were delivered to her home in Chicago, Illinois from The Children's Place shipment facility in Fort Payne, Alabama.

### II.  Defendant

12.      Defendant The Children's Place was founded in 1969.  It is incorporated in New Jersey with a principal place of business located at 500 Plaza Drive in Secaucus, New Jersey.  The Children's Place was also registered to do business in Illinois from July 18, 1988 through December 9, 2022, when its registration was revoked.  As of the time of filing of this Complaint, Defendant maintains sixteen brick-and-mortar stores throughout the state of Illinois. [3]

---

[3] https://www.childrensplace.com/us/stores.

**JURISDICTION AND VENUE**

13.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2) because: (1) there are 100 or more putative Class Members; (ii) the aggregate amount in controversy exceeds $5,000,000.00 (5 million dollars), exclusive of interest and costs; and (iii) Plaintiff and Defendant are citizens of different states. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

14.     This Court has personal jurisdiction over Defendant because it has substantial aggregate contacts throughout the United States and the state of Illinois. Defendant has engaged, and continue to engage, in conduct that has a direct, substantial, reasonably foreseeable, and intended effect of causing injury to persons throughout the United States and the state of Illinois, and it purposely availed itself of the laws of the United States and the State of Illinois, including but not limited to operation of sixteen The Children's Place stores as of the time of the filing of this Complaint.[4]

15.     Defendant is subject to personal jurisdiction in this District because it purposely avails itself of the privilege of conducting activities in the United States and the State of Illinois and directs business activities toward, and conducts business with, consumers throughout the United States and the State of Illinois through its brick-and-mortar stores, its website, its mobile application, and its marketing, which are available to consumers throughout the United States and in Illinois. Furthermore, Defendant engaged and continues to engage in conduct that has a foreseeable, substantial effect throughout the United States and the State of Illinois connected with its unlawful acts.

---

[4] https://www.childrensplace.com/us/stores. The Children's Place had maintained substantially more brick-and-mortar stores throughout Illinois and the United States but closed a number of stores post-Covid in a coordinated effort to increase its e-commerce business and market to millennial parents.

16.     Venue is proper in this District under 28 U. S. C. § 1391 because thousands of potential Class Members reside in this District; Defendant transacts business in this District; Defendant received substantial profits from Class Members who reside in this District; and Defendant intentionally avails itself of the laws within this District.

## FACTUAL ALLEGATIONS

**I.     Defendant's Business**

17.     The Children's Place designs, contracts to manufacture, sells at retail and wholesale, and licenses to sell children's clothing and merchandise predominantly at value prices, primarily under the proprietary "The Children's Place" brand name.[5]

18.     Defendant owns and operates both online and retail stores.  As of April 29, 2023, Defendant had 599 stores in the United States, Canada, and Puerto Rico. Defendant's five international franchise partners also had 212 international points of distribution in 15 countries.

19.     The Children's Place was founded in Hartford, Connecticut in 1969 and initially sold toys, apparel, and accessories.  By the early 1980s, The Children's Place was repositioned as a specialty retailer of children's apparel for newborns to pre-teens and began offering private label merchandise as well as branded product.

20.     In 2010, Jane Elfers became been President & Chief Executive Officer of The Children's Place and began the process of transforming it from a company comprised of predominantly brick-and-mortar stores to what the company refers to now as a "Global Best in Class Omni Channel Kids Specialty Retailer."[6]

21.     Defendant markets itself as a company parents can trust to provide their children

---

[5] Defendant also owns and sells under the brand names "Baby Place," "Gymboree," "Sugar & Jade," and "PJ Place."
[6] https://corporate.childrensplace.com/about-us.

with high quality clothing:

> We have achieved our success on the basis of a very simple principle: Trust. Wherever and whenever our customers choose to shop with us, they trust The Children's Place . . . to provide quality, value and style.[7]

## II. Plaintiff's Facts

22.     Plaintiff Angala Garland purchased School Uniforms for Minor Child A in 2022 from The Children's Place online store, which were delivered to her home in Chicago, Illinois. Plaintiff purchased:

- two multi-packs of Boys Pique Uniform Polos;

- one multi-pack of Boys Pique Uniform Long-sleeve Polos;

- two multi-packs of Boys Pull On Chino Cargo Uniform Pants;

- one multi-pack of Boys Uniform Chino Shorts;

- a single unit of Boys Uniform Stretch Skinny Chino Pants;

- a single unit of Boys Uniform Zip Up Mock Neck Sweater;

- two multi-packs and a single unit of Boys Uniform Active Fleece Jogger Pants; and

- two single units of Boys Uniform Zip Up Hoodie.

23.     Minor Child A wore all items during the Fall, Spring, and Summer 2022-2023 school semesters while he was four years old.

24.     Plaintiff purchased the School Uniforms because they were mandated by Minor Child A's public school located in Chicago, Illinois, which required all children wear dark blue shirts, pants, and outer layers, including sweaters and jackets.

25.     Plaintiff purchased the School Uniforms as a direct and intended result of Defendant's advertising, marketing, and promotion, and Plaintiff used them as intended.

---

[7] https://corporate.childrensplace.com/who-we-are/.

26. When purchasing the School Uniforms, Plaintiff never saw any disclosures or warnings regarding the presence of PFAS in the School Uniforms throughout Defendant's advertisements, on Defendant's website, or on the School Uniform tags. Nothing in Defendant's representations indicated to Plaintiff that the School Uniforms contained PFAS.

27. Plaintiff reasonably believed, based on Defendant's omissions, that the School Uniforms would be free from harmful chemicals such as PFAS.

28. Plaintiff sought independent third-party testing to determine whether the School Uniforms purchased from The Children's Place contained PFAS.

29. The method used in Plaintiff's independent testing is the industry standard for detecting and determining whether materials, such as the School Uniforms, comply with quality and safety standards.

30. Plaintiff's independent testing from a third-party lab found PFAS chemicals in Defendant's School Uniforms at material and above-trace amounts which were and are material to Plaintiff, consumers, and Class Members.

31. Plaintiff did not receive the benefit of her bargain when she purchased the School Uniforms. Had she been aware of Defendant's omissions concerning the presence of PFAS in the School Uniforms, she would have either not purchased them or would have paid substantially less for them.

32. Plaintiff continues to purchase school uniforms, and Plaintiff would purchase such uniforms from Defendant if they did not contain PFAS.

**III.    PFAS Chemicals**

33. PFAS are a category of man-made chemicals which may be used to enhance the performance of textiles and apparel, including, for example, by making them stain resistant, water

7

repellant, antimicrobial, or odor free.

34.     PFAS chemicals can cause serious health effects, including cancer, endocrine disruption, accelerated puberty, liver and immune system damage, and thyroid changes in children and adults.[8]  The Center for Disease Control's Agency for Toxic Substances and Disease Registry has also recognized that exposure to high levels of PFAS may impact the immune system and reduce antibody responses to vaccines.[9]

35.     PFAS chemicals are categorized as either "long-chain" or "short-chain" based on the amount of carbon atoms they contain.  Long-chain PFAS chemicals contain more than 8 carbon atoms, and short-chain PFAS chemicals contain less than 8 carbon atoms. All PFAS chemicals contain carbon-fluorine bonds—one of the strongest in nature—making them highly persistent in the environment and in human bodies.[10]

36.     Humans can be exposed to PFAS in a variety of ways, including through ingestion, inhalation, and skin absorption.[11]  In addition, PFAS found in apparel and textiles is known to migrate during laundering, which releases those chemicals into waterways.[12]

37.     Long-chain PFAS chemicals have been phased out of use in the United States and Europe due to their known toxicity to humans and the environment.  Long-chain PFAS chemicals are known as "forever chemicals."  They are bioaccumulative, meaning they build up in the body over time.  Long-chain PFAS chemicals would not be expected to appear in textiles.

38.     Short-chain PFAS chemicals are currently used in the textile and apparel industry as a substitute for long-chain PFAS chemicals.  There are no long-term studies indicating whether short-chain PFAS chemicals are safer for consumers; in fact, there are studies suggesting that they

---

[8] https://www.ewg.org/tapwater/contaminant.php?contamcode=E311 (last accessed July 24, 2023).
[9] https://www.atsdr.cdc.gov/pfas/health-effects/index.html.
[10] https://ntp.niehs.nih.gov/whatwestudy/topics/pfas/index.html
[11] *Id.*
[12] https://www2.mst.dk/Udgiv/publications/2015/04/978-87-93352-12-4.pdf.

pose similar health risks to long-chain PFAS, including bioaccumulation.[13]

39.    Recently, the U.S. Department of Health and Human Services' National Toxicology Program found that short-chain PFAS have the same adverse effects as their long-chain counterparts.[14] Their 2019 study found that both long and short-chain PFAS affected the same organ systems, with the greatest impact seen in the liver and thyroid hormone.[15]

40.    "The Madrid Statement," a scientific consensus regarding the persistence and potential for harm of PFAS substances issued by the Green Science Policy Institute and signed by more than 250 scientists from 38 countries, recommended the following actions in order to mitigate future harm: (1) discontinuing use of PFAS where not essential or safer alternatives exist; (2) labeling products containing PFAS; and (3) encouraging retailers and individual consumers to avoid products containing or manufactured using PFAS whenever possible.[16]

41.    There is ample evidence that non-PFAS chemical treatments provide comparable performance benefits for apparel. Additionally, studies have found that significant environmental and toxicological benefits could be achieved by switching apparel to non-fluorinated finishes without a significant reduction in garment water-repellency performance.[17]

42.    As a result of emerging health and environmental concerns regarding short-chain PFAS, many apparel companies, including North Face and Patagonia, have committed to phasing them out of their products completely.[18]

## IV.    PFAS in School Uniforms & Risks to Children

43.    On June 27, 2022, after the US EPA announced a new health advisory warning the public of the extreme danger to human health from PFAS, the Sierra Club published research

---

[13] See https://cen.acs.org/environment/persistent-pollutants/Short-chain-long-chain-PFAS/97/i33.
[14] https://ntp.niehs.nih.gov/whatwestudy/topics/pfas/index.html.
[15] *Id.*
[16] https://greensciencepolicy.org/our-work/science-policy/madrid-statement/.
[17] https://www.sciencedirect.com/science/article/abs/pii/S0045653517306598.
[18] https://www.gq.com/story/outdoor-gear-pfas-study.

testing children's textile products from major retailers, including The Children's Place. That research indicated that Defendant's pants tested positive for total fluorine, an indicator of the presence of PFAS chemicals.[19]

44. Shortly thereafter, On September 21, 2022, scientists at the University of Notre Dame, Indiana University, the University of Toronto, and the Green Science Policy Institute published a report in *Environmental Science and Technology* finding varying levels of PFAS in school uniforms available throughout the United States and Canada.[20] That research was subsequently widely published via various mainstream media outlets including ABC News, BBC, *Consumer Reports*, *The Guardian*, *The New York Post*, and *The Hill*.

45. About 20 percent of U.S. children wear school uniforms,[21] and the prevalence of uniforms in schools "continues to rise in the United States."[22] School uniforms are especially common and mandated in low-income and elementary schools, as well as in Catholic and other private schools.[23]

46. The presence of PFAS in school uniforms is particularly concerning, as uniforms are worn directly on the skin for upwards of eight hours per day, five days per week, by children, who are uniquely vulnerable to harmful chemicals. Due to children's lower body weight and sensitive development, exposure to PFAS at a young age for prolonged periods of time may result in a greater lifetime threat of adverse health outcomes.

47. "In general, children experience adverse health outcomes at lower internal

---

[19] https://www.sierraclub.org/sierra/how-lounge-pfas-free-bras-while-your-partner-puts-kids-less-toxic-clothes-car-seats-strollers.

[20] Per- and Polyfluoroalkyl Substances in North American School Uniforms, Xia *et. al.*, *Environmental Science & Technology* 2022 56 (19), 13845-13857.

[21] https://nces.ed.gov/fastfacts/display.asp?id=50.

[22] https://www.publicschoolreview.com/blog/uniforms-the-pros-and-cons.

[23] https://nces.ed.gov/fastfacts/display.asp?id=50.

concentrations [of PFAS]," stated Jamie DeWitt, PhD, a professor of pharmacology and toxicology at East Carolina University in Greenville, N.C., who studies the health effects of PFAS.[24]

48.     Graham Peaslee, PhD, a professor of physics at Notre Dame and a co-author of the 2022 study published in *Environmental Science and Technology* stated:

> **What was surprising about this group of samples was the high detection frequency of PFAS in the garments required for children to wear . . . Children are a vulnerable population when it comes to chemicals of concern, and nobody knows these textiles are being treated with PFAS and other toxic chemicals."[25]**

49.     Clothing treated with PFAS presents multiple routes for direct exposure and absorption into the human body via skin contact, inhalation, or ingestion. Young children are especially vulnerable to direct oral exposure due to frequent hand-to-mouth behaviors.

50.     Exposure to PFAS has been associated with numerous negative health outcomes, including increased risk of liver disease and cancer, reduced vaccine effectiveness, endocrine disruption, accelerated puberty, liver and immune system damage, and thyroid changes.

## V.     Defendant's Misrepresentations and Omissions

51.     Defendant touts the safety of its clothing and its "chemical testing protocols" throughout Annual Environment, Social and Governance (ESG) Reports. Defendant stated in a 2021 Environmental Safety Group report:

> We have developed chemical testing protocols as part of the quality and safety standards set for all of our products. During the development and production process, our products undergo testing to support compliance with regulatory requirements. This testing helps consumers have confidence that the products they

---

[24]     https://www.consumerreports.org/toxic-chemicals-substances/school-uniforms-have-high-levels-of-dangerous-pfas-chemicals-a2854000563/.

[25]     https://thehill.com/policy/equilibrium-sustainability/3652756-scientists-find-high-levels-of-forever-chemicals-in-school-uniforms/#:~:text=%E2%80%9CChildren%20are%20a%20vulnerable%20population,noted%2C%20citing%20data%20from%20Statista (emphasis added).

purchase are safe[.]

Utilization of our RSL and regulatory compliance testing help us avoid unwanted substances in finished product . . . . our chemical management goal, announced in 2019, focused on denim and woven bottom vendors based on the risk associated with their production processes. We have been assessing their chemical management systems using data collected annually through the Higg FEM and in FY21 80% of these factories met the goal of achieving the FEM Level 1 sustainability rating for chemicals. Achieving this level means those factories have built the foundation for a responsible chemical management system.[26]

52.     Contrary to representations made by Defendant, the School Uniforms contain PFAS, which is harmful to the human body and the environment, which Defendant failed to disclose.

53.     Defendant knew or should have known of the presence of PFAS in its School Uniforms, and the dangers associated with PFAS, but failed to adequately warn Plaintiff and the Class Members of the same.

54.     As a direct and proximate result of Defendant's concealment of the presence of PFAS, its deceptive representations, and its failure to sufficiently warn consumers about it or about its harmful consequences prior to their purchase, Plaintiff and the Class Members purchased and dressed their minor children in Defendant's School Uniforms, to their detriment.

55.     Plaintiff and the Class Members purchased Defendant's School Uniforms, which contained PFAS at the point of sale to the public.

56.     Plaintiff and each of the Class Members have been damaged by Defendant's false, fraudulent, unfair, deceptive, and misleading practices, as set forth fully herein, and seek compensatory damages, injunctive relief, and such other and further relief as this Court deems just and proper.

---

[26] 2021 ESG Report at p. 33, available at https://corporate.childrensplace.com/static/esgReport2021-0d2f59dc3c7b8bda361ceaa5a638fd07.pdf.

## CLASS ALLEGATIONS

57.     As detailed below, Plaintiff brings this lawsuit on behalf of herself and all others similarly situated, pursuant to Rule 23(a), (b)(2), (b)(3), and/or (c)(4) of the Federal Rules of Civil Procedure.

**I.      Class Definitions**

58.      Plaintiff seeks to represent the following Nationwide Class and Illinois Subclass (collectively, the "Classes"):

**(1)      Nationwide Class: All persons or entities in the United States who, within the applicable limitations period, purchased Defendant's School Uniforms.**

**(2)      Illinois Subclass: All persons or entities in the state of Illinois who, within the applicable limitations period, purchased Defendant's School Uniforms.**

Excluded from the Classes are Defendant and its officers, directors, affiliates, legal representatives, and employees; any governmental entities; and any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff.

59.     Plaintiff reserves the right to modify or amend the definition of the proposed Classes, or to include additional classes or subclasses, if investigation or discovery indicate that the definitions should be narrowed, expanded, or otherwise modified, before or after the Court determines whether such certification is appropriate as discovery progresses.

**II.      Numerosity**

60.     While the exact number of Class Members is presently unknown to Plaintiff, it likely consists of at least thousands of consumers throughout the United States who purchased Defendant's School Uniforms.  The precise number of Class Members is readily identifiable and can be determined by sales information and other records in the possession of Defendant and its authorized retailers.  Joinder of all members of the class is impracticable given both their volume

and geographic diversity.

### III.  Commonality

61.     This action involves common questions of law and fact, which predominate over any questions affecting individual Class Members. These common legal and factual questions include, but are not limited to, the following:

(a)     whether Defendant violated the Illinois Consumer Fraud and Deceptive Business Practices Act;

(b)     whether Defendant omitted or failed to disclose material information to Plaintiff and Class Members;

(c)     whether Defendant intended that Plaintiff and the Class Members would rely on Defendant's deceptive conduct;

(d)     whether a reasonable person would in fact be misled by Defendant's deceptive conduct;

(e)     whether Defendant knew or should have known of the presence or potential presence of PFAS in their School Uniforms;

(f)     whether Defendant knew or should have known that its omissions of fact concerning the School Uniforms are material and likely to mislead consumers;

(g)     whether Defendant concealed from Plaintiff and Class Members material facts regarding presence of PFAS chemicals in their School Uniforms;

(h)     whether Defendant intended that Plaintiff and Class Members would act upon their omissions by deciding to buy the School Uniforms;

(i)     whether Defendant provided Plaintiff and Class Members with implied warranties that the School Uniforms were merchantable and fit for the ordinary purposes for which they were sold;

(j)     whether Defendant breached implied warranties because the School Uniforms contain PFAS;

(k)     whether Defendant was unjustly enriched at the expense of Plaintiff and Class Members; and

(l)     the type and measure of damages suffered by Plaintiff and Class Members as a result of Defendant's conduct.

### VI.     Predominance

62.     The questions of law or fact common to Plaintiff and each Class Member's claims predominate over any questions of law or fact affecting only individual members of the Classes. All claims by Plaintiff and the unnamed members of the Classes are based on the common course of conduct by Defendant.

63.     Common issues predominate when, as here, liability can be determined on a class-wide basis, even when there will be some individualized damages determinations.

### IV.     Typicality

64.     Plaintiff's claims are typical of the claims of the Class Members because all purchased School Uniforms that were designed, manufactured, marketed, advertised, distributed, and sold by Defendant.  Plaintiff, like all Class Members, has been damaged by Defendant's misconduct in that, among other things, they each have incurred or will continue to incur damages because of overpaying for a product containing PFAS, which makes the product harmful to children's bodies and not fit for its intended use.

65.     Furthermore, the factual basis of Defendant's misconduct is common to all Class Members, because Defendant has engaged in systematic unlawful conduct, resulting in the same injury to all Class Members.  Plaintiff is advancing the same claims and legal theories on behalf of herself and all Class Members.  Plaintiff and Class Members have sustained damages from Defendant's common course of unlawful conduct.  Further, there are no defenses available to any Defendant that are unique to Plaintiff.

### V.     Adequacy of Representation

66.     Plaintiff will fairly and adequately protect the interests of the Members of the Class. Plaintiff has retained counsel experienced in complex consumer class action litigation, and

15

Plaintiff intends to prosecute this action vigorously. Plaintiff has no adverse, conflicting, or antagonistic interests to those of the Classes. Plaintiff anticipates no difficulty in the management of this litigation as a class action. To prosecute this case, Plaintiff has chosen the undersigned law firms, which have the financial and legal resources to meet the substantial costs and legal issues associated with this type of consumer class litigation.

## VI. Injunctive and/or Declaratory Relief

67. Defendant will continue to commit the unlawful practices alleged herein, and the minor children of Plaintiff and Class Members will remain at an unreasonable and serious safety risk because of wearing the School Uniforms containing harmful PFAS chemicals. Defendant has acted and refused to act on grounds that apply generally to the Class, such that final injunctive relief and corresponding declaratory relief is appropriate respecting the Class as a whole.

## VII. Superiority

68. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Absent a class action, Class Members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law. Because of the relatively small size of Class Members' individual claims, it is likely that few Class Members could afford to seek legal redress for Defendant's misconduct. Absent a class action, Class Members will continue to incur damages, and Defendant's misconduct will continue without remedy. Class treatment of common questions of law and fact would also be a superior method to multiple individual actions or piecemeal litigation in that class treatment will conserve the resources of the courts and the litigants and will promote consistency and efficiency of adjudication.

69. A class action is superior to individual actions for the proposed Classes, in part

because of the non-exhaustive factors listed below:

(a)    Joinder of all Class Members would create extreme hardship and inconvenience for the affected customers as they reside worldwide, nationwide, and throughout the state;

(b)    Individual claims by Class Members are impracticable because the costs to pursue individual claims exceed the value of what any one Class Member has at stake. As a result, individual Class Members have no interest in prosecuting and controlling separate actions;

(c)    There are no known individual Class Members who are interested in individually controlling the prosecution of separate actions;

(d)    The interests of justice will be well served by resolving the common disputes of potential Class Members in one forum;

(e)    Individual suits would not be cost effective or economically maintainable as individual actions; and

(f)    The action is manageable as a class action.

**VIII.   Ascertainability and Nature of Notice to the Proposed Class.**

70.    Members of the Class are readily ascertainable and identifiable. Members of the Class may be identified by records maintained by Defendant, its agents, and/or its authorized retailers.

71.    Alternative notice will be proposed in the form of traditional internet-based communications and/or notices or advertisements. Plaintiff contemplates that notice will be provided to Class Members by e-mail, mail, and published notice.

**COUNT ONE**
**Violation of Illinois' Consumer Fraud and Deceptive Business Practices Act**
**85 Ill. Comp. Stat. 505/1-505/12**
**<u>(Plaintiff Individually and on behalf of the Classes)</u>**

72.    Plaintiff repeats and re-alleges the allegations contained in paragraphs 1-71 above, as if fully set forth herein.

73.    Plaintiff and the Class Members have standing to pursue a cause of action for

violation of the Illinois Consumer Fraud and Deceptive Business Practices Act (the "IFCA"), 815 ILCS 505/1, *et seq.*, because Plaintiff and the Class Members have suffered economic losses as a result of Defendant's actions as set forth herein.

74.     The ICFA prohibits the use of unfair or deceptive business practices in the conduct of trade or commerce.  The ICFA is to be liberally construed to effectuate its purpose.  815 ILCS 505/11a.

75.     Defendant's conduct as described herein violates the ICFA because it violates public policy, it is so oppressive that the consumer has little choice but to submit, and it causes consumers substantial economic injury.

76.     Defendant's conduct, including its failure to disclose that its school uniforms contain PFAS, constitutes a violation of the act, use and employment of deception, and unfair practices in a course of conduct of trade or commerce.

77.     Defendant intended that Plaintiff and the Class Members would rely on Defendant's deceptive conduct, and a reasonable person would in fact be misled by this deceptive conduct.

78.     Defendant knew or should have known of the presence or potential presence of PFAS in their School Uniforms by at least June 27, 2022 as the result of the scientific literature and media reports described herein, and, upon information and belief, through its own product testing. Thus, Defendant knew or should have known that their products were dangerous to children and consumers.

79.     Defendant omitted or concealed material facts about the safety and usable nature of its School Uniforms.

80.     Defendant furthermore knew or should have known that its omissions of fact concerning the School Uniforms are material and likely to mislead consumers.   Under the

18

circumstances that existed, no sales of the School Uniforms should have taken place.

81.     Defendant advertised its products nationally and throughout Illinois, and Plaintiff and each of the Class Members were deceived by Defendant.  Defendant has and continues to advertise and promote its School Uniforms nationally and throughout Illinois.

82.     Like Plaintiff, Members of the Class would not have purchased the School Uniforms had they known that the School Uniforms contained PFAS.

83.     Because of Defendant's unfair and deceptive acts, the School Uniforms purchased by Plaintiff and the Class had diminished or non-existent actual or resale value because they were contaminated with PFAS and unsafe.

84.     Plaintiff and the Class Members have suffered ascertainable economic losses.

85.     Plaintiff and the Class Members did not receive the benefit of the bargain and are entitled to recover actual damages, attorneys' fees and costs, and all other relief allowed under 815 Ill. Comp. Stat. 505/1, *et. seq*.

86.     Through its deceptive practices, Defendant has improperly obtained and continues to improperly obtain and retain money from Plaintiff and the Class Members.

87.     The damages sustained by Plaintiff and the Class Members could not reasonably have been avoided because they did not know and could not have known that the School Uniforms purchased from Defendant contained PFAS, particularly as there was no warning on the product or in Defendant's advertising.

88.     Defendant's omissions in its product labeling and advertising is likely to deceive reasonable consumers because targeted consumers, like Plaintiff and Class Members (i.e., School Uniform consumers), acting reasonably in the circumstances could be misled by said deceptions and omissions.

89.     Illinois has a legitimate interest in applying its law to adjudicate this dispute and to ensure companies that do business within the state of Illinois to both resident and nonresident consumers comply with its consumer protection laws.  Accordingly, Illinois law has significant contacts to the claims asserted by the National Class so that application of its consumer fraud laws to all class claimants is not arbitrary, capricious, or unfair and is not a violation of due process.

90.     Plaintiff on behalf of herself and the Class Members seeks relief under 815 ILCS 505/10a, including but not limited to injunctive relief, damages, restitution, punitive damages, and attorneys' fees and costs.

## COUNT TWO
## Fraudulent Concealment
## (Plaintiff Individually and on behalf of the Classes)

91.     Plaintiff repeats and re-allege the allegations contained in paragraphs 1-90 above, as if fully set forth herein.

92.     PFAs are known as "forever chemicals" because they "do not easily break down in the environment and are difficult to destroy."[27]  Exposure to PFAs has been linked with an increased risk of health problems, particularly for children.[28]

93.     Defendant's School Uniforms were treated and/or exposed to PFAS during the manufacturing process.  Given the dangerous nature of PFAS, Defendant's use of/incorporation of PFAS and the presence of PFAS in its clothing products are materials fact about the safety and useability of the School Uniforms.

94.     Defendant concealed from Plaintiff and Class Members material facts regarding presence of PFAS chemicals in their School Uniforms.

---

[27] https://www.aaas.org/epi-center/pfas.
[28] https://www.usnews.com/news/health-news/articles/2022-09-21/high-levels-of-pfas-forever-chemicals-in-kids-school-uniforms.

95.      Defendant had or should have had knowledge of the concealment of such material facts by at least September 21, 2022, as the result of the scientific literature and media reports described herein, and, upon information and belief, through its own product testing.

96.      Plaintiff and Class Members were unaware of the falsity of the omissions and concealment of material facts made by Defendant.

97.      Defendant concealed such material facts with the intention inducing confidence and driving consumers to purchase the School Uniforms.

98.      Defendant intended that Plaintiff and Class Members would act upon their omissions by deciding to buy the School Uniforms.

99.      The presence of harmful PFAS in Defendant's School Uniforms is the type of information upon which buyers, like Plaintiff and Class Members, would be expected to rely upon in making a purchasing decision.

100.    Plaintiff and Class Members would have acted differently by either not buying the School Uniforms, or paying a reduced purchase price, for the School Uniforms had they known about Defendant's advertising and labeling omissions regarding PFAS.

101.    Defendant' concealment resulted in damage to Plaintiff and Class Members, including but not limited to the loss of funds expended for School Uniform purchases.

102.    Defendant is therefore liable for Plaintiff's and Class Members' injuries.

**COUNT THREE**
**Breach of Implied Warranty**
**(Plaintiff Individually and on behalf of the Classes)**

103.    Plaintiff repeats and re-allege the allegations contained in paragraphs 1-102 above, as if fully set forth herein.

104.    Defendant manufactured, marketed, advertised, distributed, and sold the School

Uniforms as part of its regular course of business.

105.     Defendant was at all times relevant the manufacturer, distributor, warrantor, and/or seller of the School Uniforms.

106.     Defendant knew or should have known the specific use for which the School Uniforms were purchased, including that the School Uniforms were purchased to be worn by minor children for upwards of eight hours per day, five days per week.

107.     Plaintiff and the Class Members purchased the School Uniforms directly from Defendant or through authorized retailers.

108.     By placing the School Uniforms into the stream of commerce and selling them to consumers for the purpose of being worn by minor children for upwards of eight hours per day, five days per week, Defendant provided Plaintiff and Class Members with implied warranties that the School Uniforms were merchantable and fit for the ordinary purposes for which they were sold.

109.     However, the School Uniforms are not fit for their ordinary purpose because the School Uniforms contain PFAS, a chemical that is harmful to children and the environment.

110.     The problems associated with the School Uniforms, including increased exposure to toxic PFAS and increased risk of serious adverse health effects, including cancer, endocrine disruption, accelerated puberty, liver and immune system damage, and thyroid changes, prevents the School Uniforms from being safely used for their intended purpose, and thus constitutes a breach of the implied warranty of merchantability.

111.     Defendant failed to adequately warn Plaintiff and the Class Members of the presence of PFAS and that minor children's wearing of the School Uniforms for upwards of eight hours per day, five days per week, presents a significant level of exposure to toxic chemicals and risk of resulting injury.

112.     The presence of PFAS rendered the School Uniforms unfit for their intended use and purpose and substantially impaired the use and value of the School Uniforms.

113.     As the manufacturer, marketer, advertiser, distributer, and seller of the School Uniforms, Defendant is the only party with knowledge and notice of the fact that the School Uniforms contains harmful chemicals.

114.     That the School Uniforms contained PFAS was not discoverable by Plaintiff and the Class Members at the time they purchased the School Uniforms.

115.     Defendant impliedly warranted that the School Uniforms were of merchantable quality and fit for such use.  These implied warranties included, among other things: (i) a warranty that School Uniforms manufactured, supplied, distributed, and/or sold by Defendant were safe and reliable for use by children for upwards of eight hours per day, five days per week, and (ii) a warranty that the School Uniforms would be fit for its intended use.

116.     Contrary to the applicable implied warranties, the School Uniforms, at the time of sale and thereafter, were not fit for its ordinary and intended purpose of providing Plaintiff and Class Members with safe clothing for their children.  Instead, the School Uniforms contain harmful chemicals.

117.     Defendant's actions, as complained of herein, breached the implied warranties that the School Uniforms were of merchantable quality and fit for such use.

118.     Defendant's intended beneficiaries of these implied warranties were ultimately Plaintiff and the Class, not third-party retailers, resellers, or distributors who sold the School Uniforms.  Moreover, Defendant exercises substantial control over which outlets can carry and sell its Product, which are the same places that Plaintiff and Class Members purchased the School Uniforms.  In addition, Defendant's warranties are in no way designed to apply to the third-party retailers, resellers or distributors who purchase the School Uniforms in bulk and then sell them on an individual basis to consumers.  Individual consumers are the ones who ultimately review the labels prior to making any purchasing decisions.  Accordingly, these warranties are specifically designed to benefit the individual consumers who purchased the School Uniforms.

119.     Plaintiff and Class Members sustained damages as a direct and proximate result

of Defendant's breaches in that they paid a premium for the School Uniforms that they would not have otherwise paid.

120.     Plaintiffs and the Class also did not receive the value of the School Uniforms they paid for—the School Uniforms are worthless or worth far less than Defendant represents due to the presence of PFAS.

121.     Plaintiff and the Class have sustained, are sustaining, and will sustain damages if Defendant continues to engage in such deceptive, unfair, and unreasonable conduct.

122.     As a result of the breach of the implied warranty of merchantability, Plaintiff and Class Members are entitled to all damages, in addition to costs, interest and fees, including attorneys' fees, as allowed by law.

**COUNT FOUR**
**Unjust Enrichment**
**(Plaintiff Individually and on behalf of the Classes)**

123.      Plaintiff repeats and re-allege the allegations contained in paragraphs 1-122 above, as if fully set forth herein.

124.     Plaintiff and Class Members conferred a monetary benefit on Defendant, and Defendant had knowledge of this benefit. The retail price for the School Uniforms listed on Defendant's website is up to $79.99.

125.      By its wrongful acts and omissions described herein, including selling the School Uniforms containing PFAS, Defendant was unjustly enriched at the expense of Plaintiff and Class Members.

126.      Plaintiff and Class Members' detriment and Defendant's enrichment were related to and flowed from the wrongful conduct alleged herein.

127.     Defendant has profited from its unlawful, unfair, misleading, and deceptive practices at the expense of Plaintiff and Class Members under circumstances in which it would be inequitable for Defendant to retain the profits, benefits, and other compensation obtained from its wrongful conduct as described herein in connection with selling the School Uniforms.

128.     Plaintiff and the Class Members have been damaged as a direct and proximate result of Defendant's unjust enrichment because they would not have purchased the School Uniforms on the same terms or for the same price had they known that the School Uniforms contained PFAS.

129.     Defendant either knew or should have known that payments rendered by Plaintiff and the Class Members were given and received with the expectation that the School Uniforms were free of PFAS.  It is inequitable for Defendant to retain the benefit of payments under these circumstances.

130.     Plaintiff and the Class Members are in privity with Defendant because Defendant directly sold the School Uniforms to Plaintiff and the Class Members via brick-and-mortar stores, its official website, and/or its official Amazon storefront.

131.      As a direct and proximate result of Defendant's wrongful conduct and unjust enrichment, Plaintiff and the Class Members are entitled to restitution of, disgorgement of, and/or imposition of a constructive trust upon all profits, benefits, and other compensation obtained by Defendant for its inequitable and unlawful conduct.

## <u>PRAYER FOR RELIEF</u>

**WHEREFORE,** Plaintiff prays for a judgment on behalf of herself and the Classes:

a.     Certifying the Classes as requested herein;

b.     Awarding actual, direct and compensatory damages;

c.     Awarding punitive damages as appropriate;

d.     Awarding injunctive and/or declaratory relief as appropriate;

e.     Awarding restitution and disgorgement of revenues as appropriate;

f.     Awarding allowable attorneys' fees and costs pursuant to Federal Rule of Civil Procedure 54, or any other applicable provision or principle of law; and

g.     Providing such further relief as may be just and proper.

25

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial as to all claims so triable.


[*signatures to follow on next page*]

Dated: July 27, 2023

Respectfully submitted,

By: */s/ E. Samuel Geisler*
E. Samuel Geisler (IL Bar No. 6305996)
Bryan F. Aylstock, Esq. (pro hac vice forthcoming)
D. Nicole Guntner, Esq. (pro hac vice forthcoming)
**AYLSTOCK, WITKIN, KREIS & OVERHOLTZ**
sgeisler@awkolaw.com
baylstock@awkolaw.com
nguntner@awkolaw.com
17 East Main Street, Suite 200
Pensacola, FL 32502
Telephone: 850-202-1010
Fax: 850-916-7449

*Counsel for Plaintiffs and the Class*

**BRADLEY/GROMBACHER, LLP**
Marcus J. Bradley, Esq. (174156)
(pro hac vice forthcoming)
Kiley L. Grombacher, Esq. (245960)
(pro hac vice forthcoming)
Robert N. Fisher, Esq. (302919)
(pro hac vice forthcoming)
31365 Oak Crest Drive, Suite 240
Westlake Village, California 91361
Telephone: (805) 270-7100
Facsimile: (805) 270-7589
E-Mail: mbradley@bradleygrombacher.com
kgrombacher@bradleygrombacher.com
rfisher@bradleygrombacher.com

*Counsel for Plaintiffs and the Class*