**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| ANGALA GARLAND AND JOELIS SALDANA, individually and on behalf of all others similarly situated, | CASE NO. 1:23-cv-04899 |
| Plaintiffs, | Hon. Matthew F. Kennelly |
| v. | CLASS ACTION |
| THE CHILDREN'S PLACE, INC. | |
| Defendant. | |

**FIRST AMENDED CLASS ACTION COMPLAINT
AND DEMAND FOR JURY TRIAL**

Plaintiffs hereby file this First Amended Complaint on behalf of themselves and all other similarly situated consumers against Defendant The Children's Place, Inc. (hereinafter, "The Children's Place" or "Defendant") and complains and alleges as follows upon personal knowledge as to Plaintiffs and their own acts and experiences and, as to all other matters, upon information and belief, including investigation and research conducted into Plaintiffs' claims by Plaintiffs' attorneys out of respect for governing law and the procedures of the Court.

**INTRODUCTION**

1. This is a civil class action brought on behalf of all persons who have purchased for personal or household use school uniforms designed, manufactured, promoted, and sold by Defendant The Children's Place (hereinafter, the "School Uniforms").

2. Defendant's School Uniforms are marketed and sold to parents of school-aged children for wear in public and private schools throughout the United States and Illinois.

1

3.      Multiple rounds of independent testing of not only School Uniforms purchased by Plaintiffs, but also *unopened, unworn, and unwashed* school uniforms manufactured by Defendant, have indicated the presence of multiple polyfluoroalkyl substances ("PFAS"), harmful chemicals that are a known safety hazard to children and to the environment.

4.      The presence of PFAS in not only the School Uniforms Plaintiffs purchased, but also in the *unopened*, *unworn*, *and unwashed* School Uniforms, establishes that Defendant produces its School Uniforms in a manner that creates a substantial risk of PFAS contamination that is not confined solely to those purchased by Plaintiffs.

5.      As described fully below, Defendants produce, market, and sell School Uniforms that are intended to be worn upwards of eight hours a day, five days a week, by a vulnerable population: school-aged children.  Despite the known health risks associated with these dangerous compounds, Defendant continues to manufacture its School Uniforms in a manner that has resulted in PFAS contamination.  Upon information and belief, Defendant has either failed to sufficiently test for the presence of PFAS compounds in its School Uniforms prior to sale or has chosen to continue to production despite knowledge of the presence of PFAS compounds in its School Uniforms.

6.      Plaintiff Angala Garland is the mother of Minor Child A, a minor.

7.      Plaintiff Joelis Saldana is the mother of Minor Child B and Minor Child C, both minors.

8.      Plaintiffs seek damages and equitable remedies for themselves and for the putative Class.

9.      Defendant The Children's Place designs, manufactures, markets, advertises, distributes, and sells the School Uniforms to consumers throughout the United States, including in

2

this District.  Defendant's' products are sold in brick-and-mortar The Children's Place stores and online through The Children's Place's official website[1] and official Amazon storefront.[2]

10.     The School Uniforms are marketed to parents of school-age children and intended to be worn by school-aged children for upwards of eight hours per day, five days per week.  The young children who wear Defendant's School Uniforms are uniquely vulnerable and susceptible to the adverse health outcomes associated with PFAS due to their low body weight, sensitive development, prolonged periods of wear during the school week, and direct oral exposure due to frequent hand-to-mouth behaviors.  The levels of PFAS in the School Uniforms pose a greater body burden and higher health dangers to children than to adults exposed to the same levels of PFAS.

11.     Defendant has knowingly and willfully concealed the true, unsafe nature of its School Uniforms to consumers.

12.     Defendant's misbranding and omission of material facts concerning the true, unsafe nature of their School Uniforms was intentional, and it renders the School Uniforms worthless or less valuable.

13.     If Defendant had disclosed to Plaintiffs and Class Members that the School Uniforms contained PFAS, Plaintiffs and the Class Members would not have purchased the School Uniforms.  Each Plaintiff alleges that she would have instead either purchased other school uniforms that are free from PFAS or would have paid less for the School Uniforms at issue.

14.     As a result of Defendant's misconduct, Plaintiffs and the Class Members have suffered economic damages.

---

[1] Available at https://www.childrensplace.com/us.
[2] Available at www.Amazon.com/TheChildrensPlace.

## PARTIES

### I.  Plaintiffs

15.    Plaintiff Angala Garland and her child, Minor Child A, are citizens and residents of Chicago, Illinois.  Plaintiff Angala Garland is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff purchased numerous School Uniform items in 2022 from The Children's Place online store, which were delivered in their original packaging to her home in Chicago, Illinois from The Children's Place shipment facility in Fort Payne, Alabama.  A School Uniform shirt purchased by Plaintiff tested positive for N-MeFOSAA, a PFAS substance.

16.    Plaintiff Joelis Saldana and her children, Minor Child B and Minor Child C, are citizens and residents of Miami, Florida.  Plaintiff Joelis Saldana is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Joelis Saldana purchased numerous School Uniform items in 2023 from The Children's Place online store, which were delivered in their original packaging to her home in Miami, Florida from The Children's Place shipment facility in Fort Payne, Alabama.  Numerous items purchased by Plaintiff tested positive for total fluorine ("Total-F"), a known indicator of PFAS.

### II.  Defendant

17.    Defendant The Children's Place was founded in 1969.  It is incorporated in New Jersey with its principal place of business located at 500 Plaza Drive in Secaucus, New Jersey. The Children's Place was also registered to do business in Illinois from July 18, 1988 through December 9, 2022, when its registration was revoked.  As of the time of filing of this Complaint, Defendant maintains sixteen brick-and-mortar stores throughout the state of Illinois. [3]

---

[3] https://www.childrensplace.com/us/stores.

## JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.

§ 1332(d)(2) because: (1) there are 100 or more putative Class Members; (ii) the aggregate amount

in controversy exceeds $5,000,000.00 (5 million dollars), exclusive of interest and costs; and (iii)

Plaintiffs and Defendant are citizens of different states. This Court has supplemental jurisdiction

over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

19.     This Court has personal jurisdiction over Defendant because it has substantial

aggregate contacts throughout the United States and the state of Illinois.  Defendant has engaged,

and continues to engage, in conduct that has a direct, substantial, reasonably foreseeable, and

intended effect of causing injury to persons throughout the United States and the state of Illinois,

and it purposely availed itself of the laws of the United States and the State of Illinois, including

but not limited to operation of sixteen The Children's Place stores as of the time of the filing of

this Complaint.[4]

20.     Defendant is subject to personal jurisdiction in this District because it purposely

avails itself of the privilege of conducting activities in the United States and the State of Illinois

and directs business activities toward, and conducts business with, consumers throughout the

United States and the State of Illinois through its brick-and-mortar stores, its website, its mobile

application, and its marketing, which are available to consumers throughout the United States and

in Illinois.  Furthermore, Defendant engaged and continues to engage in conduct that has a

foreseeable, substantial effect throughout the United States and the State of Illinois connected with

---

[4] https://www.childrensplace.com/us/stores. The Children's Place had maintained substantially
more brick-and-mortar stores throughout Illinois and the United States but closed a number of
stores post-Covid in a coordinated effort to increase its e-commerce business and market to
millennial parents.

its unlawful acts.

21.     Venue is proper in this District under 28 U.S. C. § 1391 because hundreds, if not thousands, of Class Members reside in this District, including Plaintiff Garland; Defendant transacts business in this District; Defendant received substantial profits from Class Members who reside in this District; and Defendant intentionally avails itself of the laws within this District.

## FACTUAL ALLEGATIONS

### I.     Defendant's Business

22.     The Children's Place designs, contracts to manufacture, sells at retail and wholesale, and licenses to sell children's clothing and merchandise predominantly at value prices, primarily under the proprietary "The Children's Place" brand name.[5]

23.     Defendant owns and operates both online and retail stores.  As of April 29, 2023, Defendant had 599 stores in the United States, Canada, and Puerto Rico. Defendant's five international franchise partners also had 212 international points of distribution in 15 countries.

24.     The Children's Place was founded in Hartford, Connecticut in 1969 and initially sold toys, apparel, and accessories.  By the early 1980s, The Children's Place was repositioned as a specialty retailer of children's apparel for newborns to pre-teens and began offering private label merchandise as well as branded product.

25.     In 2010, Jane Elfers became been President & Chief Executive Officer of The Children's Place and began the process of transforming it from a company comprised of predominantly brick-and-mortar stores to what the company refers to now as a "Global Best in Class Omni Channel Kids Specialty Retailer."[6]

---

[5] Defendant also owns and sells under the brand names "Baby Place," "Gymboree," "Sugar & Jade," and "PJ Place."
[6] https://corporate.childrensplace.com/about-us.

26.     Defendant markets itself as a company parents can trust to provide their children with high quality clothing:

> We have achieved our success on the basis of a very simple principle: Trust. Wherever and whenever our customers choose to shop with us, they trust The Children's Place . . . to provide quality, value and style.[7]

## II.  Plaintiffs' Facts

### a.  Plaintiff Angala Garland

27.     Plaintiff Angala Garland purchased numerous School Uniform items for Minor Child A in 2022 from The Children's Place online store, which were delivered to her home in Chicago, Illinois.  Plaintiff purchased:

- Two multi-packs of Boys Pique Uniform Polos;
- One multi-pack of Boys Pique Uniform Long-sleeve Polos;
- Two multi-packs of Boys Pull On Chino Cargo Uniform Pants;
- One multi-pack of Boys Uniform Chino Shorts;
- One Boys Uniform Stretch Skinny Chino Pants;
- One Boys Uniform Zip Up Mock Neck Sweater;
- Two multi-packs and a single unit of Boys Uniform Active Fleece Jogger Pants; and
- Two single units of Boys Uniform Zip Up Hoodie.

28.     Minor Child A wore all items during the Fall, Spring, and Summer 2022-2023 school semesters while he was four years old.

29.     Plaintiff Angala Garland purchased the School Uniforms because they were mandated by Minor Child A's public school located in Chicago, Illinois, which required all children wear dark blue shirts, pants, and outer layers, including sweaters and jackets.

30.     Plaintiff Angala Garland purchased the School Uniforms as a direct and intended result of Defendant's advertising, marketing, and promotion.  Plaintiff used the School Uniforms as intended.

---

[7] https://corporate.childrensplace.com/who-we-are/.

31.     When purchasing the School Uniforms, Plaintiff Angala Garland never saw any disclosures or warnings regarding the presence of PFAS in the School Uniforms throughout Defendant's advertisements, on Defendant's website, or on the School Uniform tags.  Nothing in Defendant's representations indicated to Plaintiff that the School Uniforms contained PFAS.

32.     Plaintiff Angala Garland reasonably believed, based on Defendant's omissions, that the School Uniforms would be free from harmful chemicals such as PFAS.

33.     Plaintiff Angala Garland sought independent third-party testing of two School Uniform items to determine whether the School Uniforms purchased from The Children's Place, and worn by Minor Child A, contained PFAS.

34.     The method used in Plaintiff Angala Garland's independent testing is the industry standard for detecting and determining whether materials, such as the School Uniforms, comply with quality and safety standards.

35.     Plaintiff Angala Garland's independent testing from a third-party lab indicated the presence of PFAS chemicals in one of the two items tested. A School Uniform shirt manufactured by Defendant contained a PFAS substance at material and above-trace amounts which were and are material to Plaintiff, consumers, and Class Members.

36.     Plaintiff Angala Garland did not receive the benefit of her bargain when she purchased the School Uniforms.  Had she been aware of Defendant's omissions concerning the presence of PFAS in the School Uniforms, she would have either not purchased them or would have paid substantially less for them.

37.     Plaintiff Angala Garland continues to purchase school uniforms, and Plaintiff Angala Garland continues to encounter The Children's Place's advertisement and promotion of the School Uniforms.  Plaintiff would again purchase School Uniforms from Defendant if they did

8

not contain PFAS.

**b. Plaintiff Joelis Saldana**

38.     Plaintiff Joelis Saldana purchased multiple School Uniform items for Minor Child

B and Minor Child C in 2023 from The Children's Place online store, which were delivered to her

home in Miami, Florida.  Plaintiff purchased:

- Boy uniform shorts in navy;
- Boy uniform polo shirt in white;
- Two Boy uniform shirts in navy;
- Girls uniform skort in beige;
- Girls uniform skort in navy;
- Girls uniform shirt in white;
- Three Girls uniform shirts in navy;
- Boys uniform joggers in beige;
- Boys uniform joggers in navy; and
- Girls uniform pants in beige.

39.     Minor Child B and Minor Child C wore all thirteen items during the Spring 2023

and Fall 2023 school semesters while Minor Child B was six years old and Minor Child C was

five years old.

40.     Plaintiff Joelis Saldana purchased the School Uniforms because they were

mandated by Minor Child B's and Minor Child C's public school located in Miami, Florida, which

required all children wear navy or khaki bottoms and navy or white tops.

41.     Plaintiff Joelis Saldana purchased the School Uniforms as a direct and intended

result of Defendant's advertising, marketing, and promotion.  Plaintiff used the School Uniforms

as intended.

42.     When purchasing the School Uniforms, Plaintiff Joelis Saldana never saw any

disclosures or warnings regarding the presence of PFAS in the School Uniforms throughout

Defendant's advertisements, on Defendant's website, or on the School Uniform tags.  Nothing in

Defendant's representations indicated to Plaintiff Joelis Saldana that the School Uniforms

contained PFAS.

43. Plaintiff Joelis Saldana reasonably believed, based on Defendant's omissions, that the School Uniforms would be free from harmful chemicals such as PFAS.

44. Plaintiff Joelis Saldana sought independent third-party testing to determine whether the School Uniforms purchased from The Children's Place, and worn by Minor Child B and Minor Child C, contained PFAS.

45. The method used in Plaintiff Joelis Saldana's independent testing is the industry standard for detecting and determining whether materials, such as the School Uniforms, comply with quality and safety standards.

46. Plaintiff Joelis Saldana's independent testing from a third-party lab indicated the presence of Total-F, a known indicator of PFAS chemicals, in each of the thirteen School Uniform items tested, at material and above-trace amounts which were and are material to Plaintiff, consumers, and Class Members.

47. Plaintiff Joelis Saldana did not receive the benefit of her bargain when she purchased the School Uniforms. Had she been aware of Defendant's omissions concerning the presence of PFAS in the School Uniforms, she would have either not purchased them or would have paid substantially less for them.

48. Plaintiff Joelis Saldana continues to purchase school uniforms. Plaintiff Joelis Saldana continues to encounter The Children's Place's advertisement and promotions of the School Uniforms. Plaintiff would again purchase School Uniforms from Defendant if they did not contain PFAS.

10

**III.    Multiple Rounds of Independent Testing of Defendant's School Uniforms Indicated the Presence of PFAS.**

49.    Multiple rounds of independent, industry-standard testing of not only School Uniform items purchased by Plaintiffs and worn by their minor children, but also *unopened, unworn, and unwashed* School Uniform items purchased from Defendant, have indicated the presence of these harmful PFAS chemicals.

50.    Thirty out of thirty-four of Defendant's School Uniforms tested positive for Total-F or for specific PFAS chemicals.  Those items that tested positive include:

- Boys Belted Chino Shorts with Stain and Wrinkle Resistance
- Boys Belted Chino Pants with Stain and Wrinkle Resistance;
- Boys Polo with Stain Resistance – Short Sleeve;
- Boys Polo with Stain Resistance – Long Sleeve;
- Boys Oxford Button Down Shirt with Stain and Wrinkle Resistance;
- Boys Uniform Shorts in Navy;
- Boys Uniform Polo Shirt in White;
- Boys Uniform Shirt in Navy;
- Boys Uniform Shirt in Navy;
- Boys Uniform Shirt in Navy;
- Boys Uniform Joggers in Beige;
- Boys Uniform Joggers in Navy;
- Girls Ruffle Polo with Stain Resistance in Red;
- Girls Button Down Shirt with Stain and Wrinkle Resistance;
- Girls Belted Chino Shorts with Stain and Wrinkle Resistance;
- Girls Pleated Jumper with Stain and Wrinkle Resistance;
- Girls Ruffle Polo with Stain Resistance in White;
- Girls Pleated Skort with Stain and Wrinkle Resistance;
- Girls Belted Chino Pants with Stain and Wrinkle Resistance;
- Girls Uniform Skort in Beige;
- Girls Uniform Skort in Navy;
- Girls Uniform Shirt in White Ruffle;
- Girls Uniform Shirts in Navy Ruffle;
- Girls Uniform Shirts in Navy Ruffle;
- Girls Uniform Shirts in Navy Ruffle;
- Girls Uniform Pants in Beige;
- Girls Uniform Tights in Tidal;
- Girls Uniform Tights in Tidal;
- Girls Uniform Tights in Black; and

11

• Girls Uniform Tights in White.

51. That *unopened, unworn, and unwashed* uniforms produced and sold by Defendant tested positive for PFAS establishes that Defendant produces its School Uniforms in a manner that creates a substantial risk of PFAS contamination in clothing it intends to be worn by a vulnerable population—school-age children—and that, upon information and belief, Defendant either foregoes sufficient testing to detect the presence of PFAS compounds and withhold such uniforms from sale or has chosen to continue production despite knowledge of the presence of PFAS compounds in its School Uniforms.

### a. Testing of Plaintiff Angala Garland's School Uniform Items

52. Two school uniform items worn by Plaintiff Angala Garland's Minor Child A were tested by an independent third-party lab using industry-standard testing.

53. One of the two items, a navy shirt manufactured by Defendant, tested positive for 260 ng/kg of N-MeFOSAA, exceeding the reference level ("RL") of 200 ng/kg.

54. According to the Environmental Working Group, "NMeFOSAA and other perfluorinated chemicals can cause serious health effects, including cancer, endocrine disruption, accelerated puberty, liver and immune system damage, and thyroid changes" and can accumulate in people.[8]

55. Only nine utilities nationwide have reported N-MeFOSAA in drinking water, none of which were located in Illinois.[9]

### b. Testing of Plaintiff Joelis Saldana's School Uniform Items

56. Thirteen school uniform items worn by Plaintiff Joelis Saldana's Minor Children B

---

[8] https://www.ewg.org/tapwater/contaminant.php?contamcode=E311.
[9] *Id.*

and C were tested by an independent third-party lab using industry standard testing.

57.     Each of the thirteen School Uniform items manufactured by Defendant tested positive for Total-F, a known indicator of PFAS.  These items have not yet undergone additional testing for Specific PFAS chemicals.

58.     The School Uniform items that tested positive for Total-F include:

- Boys Uniform shorts in navy;
- Boys Uniform polo shirt in white;
- Boys Uniform shirts in navy;
- Boys Uniform shirts in navy;
- Boys Uniform joggers in beige;
- Boys Uniform Joggers in Navy;
- Girls Uniform Skort in Beige;
- Girls Uniform Skort in Navy;
- Girls Uniform Shirt in White Ruffle;
- Girls Uniform Shirts in Navy Ruffle;
- Girls Uniform Shirts in Navy Ruffle;
- Girls Uniform Shirts in Navy Ruffle; and
- Girls Uniform Pants in Beige.

**c.   Testing of Unopened, Unworn, and Unwashed School Uniform Items Manufactured by Defendant**

59.     Plaintiff's counsel purchased additional *unopened, unworn and unwashed* School Uniforms directly from The Children's Place's website and its Amazon storefront in an effort to continue Plaintiffs' and their counsel's reasonable, good faith investigation into the presence of PFAS in Defendant's products.

60.     Plaintiffs' counsel sent the unopened, unworn, and unwashed School Uniforms to two separate independent laboratories in Defendant's original packaging.

61.     The School Uniforms were tested by scientists at those two separate, independent labs using industry-standard testing.  This additional testing indicated the presence of both Total-F and specific PFAS compounds in numerous *unworn, unopened and unwashed* School Uniform products.

62.    Results from one lab indicated the presence of Total-F in twelve School Uniform items, including:

- Boys Belted Chino Shorts with Stain and Wrinkle Resistance: 1040 Total F
- Boys Belted Chino Pants with Stain and Wrinkle Resistance: 1020 Total F
- Boys Polo with Stain Resistance – Short Sleeve – 955 Total F
- Boys Polo with Stain Resistance – Long Sleeve – 965 Total F
- Boys Oxford Button Down Shirt with Stain and Wrinkle Resistance – 1070 Total F
- Girls Ruffle Polo with Stain Resistance – Red: 555 Total F
- Girls Button Down Shirt with Stain and Wrinkle Resistance: 923 Total F
- Girls Belted Chino Shorts with Stain and Wrinkle Resistance: 1070 Total F
- Girls Pleated Jumper with Stain and Wrinkle Resistance: 1150 Total F
- Girls Ruffle Polo with Stain Resistance – White – 923 Total F
- Girls Pleated Skort with Stain and Wrinkle Resistance – 1030 Total F
- Girls Belted Chino Pants with Stain and Wrinkle Resistance – 709 Total F

63.    Results from a second lab indicated the presence of specific PFAS chemicals in four out of eight of Defendant's School Uniform items that were tested, including:

- 2 Pack of Girls Uniform Tights – Tidal
  - PFOA (Perfluorooctanoic Acid): 180 ng/kg (RL 180);
  - PFOS (Perfluorooctane Sulfonic Acid): 690 ng/kg (RL 180);
  - PFOS-LN (Perfluorooctane Sulfonic Acid) – LN: 400 ng/kg (RL 180); and
  - PFOS-BR (Perfluorooctane Sulfonic Acid) – BR: 270 ng/kg (RL 180).

- 2 Pack of Girls Uniform Tights – Black and White
  - PFOA (Perfluorooctanoic Acid): 340 ng/kg (RL 160);
  - PFOS (Perfluorooctane Sulfonic Acid): 240 ng/kg (RL 160) and;
  - 9Cl-PF3ONS (9-chlorohexadecafluoro-3-oxanone1-sulfonic acid): 390 ng/kg (RL 160).

## IV.    PFAS Chemicals

64.    PFAS are a category of man-made chemicals that may be used to enhance the performance of textiles and apparel, including, for example, by making them stain resistant, water repellant, antimicrobial, or odor free.

65.    PFAS chemicals can cause serious health effects, including cancer, endocrine disruption, accelerated puberty, liver and immune system damage, and thyroid changes in

14

children and adults.[10]   The Center for Disease Control's Agency for Toxic Substances and Disease Registry has also recognized that exposure to high levels of PFAS may impact the immune system and reduce antibody responses to vaccines.[11]

66.      Injuries or adverse health outcomes resulting from PFAS exposure may be latent manifestations of exposure during sensitive periods of development, such as in childhood.[12]  It is also possible that some PFAS-related adverse health outcomes observed in adulthood are due to chronic, lifelong exposure.[13]

67.      PFAS chemicals are categorized as either "long-chain" or "short-chain" based on the amount of carbon atoms they contain.  Long-chain PFAS chemicals contain more than 8 carbon atoms, and short-chain PFAS chemicals contain less than 8 carbon atoms. All PFAS chemicals contain carbon-fluorine bonds—one of the strongest in nature—making them highly persistent in the environment and in human bodies.[14]

68.      Humans can be exposed to PFAS in a variety of ways, including through ingestion, inhalation, and skin absorption.[15]  In addition, PFAS found in apparel and textiles is known to migrate during laundering, which releases those chemicals into waterways.[16]

69.      Long-chain PFAS chemicals have been phased out of use in the United States and Europe due to their known toxicity to humans and the environment.  Long-chain PFAS chemicals are known as "forever chemicals."  They are bioaccumulative, meaning they build up in the body

---

[10] https://www.ewg.org/tapwater/contaminant.php?contamcode=E311 (last accessed July 24, 2023).
[11] https://www.atsdr.cdc.gov/pfas/health-effects/index.html.
[12] See Blake BE, Fenton SE. Early life exposure to per- and polyfluoroalkyl substances (PFAS) and latent health outcomes: A review including the placenta as a target tissue and possible driver of peri- and postnatal effects. Toxicology. Oct. 2020.
[13] Id.
[14] https://ntp.niehs.nih.gov/whatwestudy/topics/pfas/index.html.
[15] Id.
[16] https://www2.mst.dk/Udgiv/publications/2015/04/978-87-93352-12-4.pdf.

over time.  Long-chain PFAS chemicals would not be expected to appear in textiles.

70.     Short-chain PFAS chemicals are currently used in the textile and apparel industry as a substitute for long-chain PFAS chemicals.  There are no long-term studies indicating whether short-chain PFAS chemicals are safer for consumers; in fact, there are studies suggesting that they pose similar health risks to long-chain PFAS, including bioaccumulation.[17]

71.     Recently, the U.S. Department of Health and Human Services' National Toxicology Program found that short-chain PFAS have the same adverse effects as their long-chain counterparts.[18] Their 2019 study found that both long and short-chain PFAS affected the same organ systems, with the greatest impact seen in the liver and thyroid hormone.[19]

72.     "The Madrid Statement," a scientific consensus regarding the persistence and potential for harm of PFAS substances issued by the Green Science Policy Institute and signed by more than 250 scientists from 38 countries, recommended the following actions in order to mitigate future harm: (1) discontinuing use of PFAS where not essential or safer alternatives exist; (2) labeling products containing PFAS; and (3) encouraging retailers and individual consumers to avoid products containing or manufactured using PFAS whenever possible.[20]

73.     There is ample evidence that non-PFAS chemical treatments provide comparable performance benefits for apparel. Additionally, studies have found that significant environmental and toxicological benefits could be achieved by switching apparel to non-fluorinated finishes without a significant reduction in garment water-repellency performance.[21]

74.     As a result of emerging health and environmental concerns regarding short-chain PFAS, many apparel companies, including North Face and Patagonia, have committed to phasing

---

[17] See https://cen.acs.org/environment/persistent-pollutants/Short-chain-long-chain-PFAS/97/i33.
[18] https://ntp.niehs.nih.gov/whatwestudy/topics/pfas/index.html.
[19] *Id.*
[20] https://greensciencepolicy.org/our-work/science-policy/madrid-statement/.
[21] https://www.sciencedirect.com/science/article/abs/pii/S0045653517306598.

them out of their products completely.[22]

## V.    PFAS in School Uniforms & Risks to Children

75.    On May 4, 2022, the Journal of Environmental Science and Technology published research conducted by Silent Spring, which tested children's textile products from major retailers, including The Children's Place.[23]  That research indicated that Defendant's pants tested positive for Total-F, an indicator of the presence of PFAS chemicals.  *Id.*  Specifically, a pair of pants manufactured by Defendant[24] contained 29 ppm of total-fluorine, an indicator of PFAS.[25]  Additional testing for 36 targeted PFAS chemicals was conducted.  Fifteen target PFAS chemicals appear to have been present in a pair of Defendant's pants in trace amounts that were below the method reporting limit range.[26]  This research was subsequently publicized in the Sierra Club on June 27, 2022.[27]  At a minimum, this study should have put Defendant on notice of the possibility of PFAS in its products and alerted it to the need for further testing on its products, particularly

---

[22] https://www.gq.com/story/outdoor-gear-pfas-study.

[23] Ex. 1, How Well Do Product Labels Indicate the Presence of PFAS in Consumer Items Used by Children and Adolescents? Kathryn M. Rodgers, Christopher H. Swartz, James Occhialini, Philip Bassignani, Michelle McCurdy, and Laurel A. Schaider *Environmental Science & Technology* 2022 *56* (10), 6294-6304.

[24] https://silentspring.org/sites/default/files/news/Table_children's%20products%20tested%20for%20PFAS.pdf (last accessed Nov. 13, 2023) (item C-6).  The table indicates that while Total F was detected, PFAS was not detected.  As explained supra, it appears that fifteen target PFAS chemicals were present in amounts below the method reporting limit range.

[25] Ex. 2, Supporting information Table S1 (Item C-6).

[26] *Id*; *see also* Ex. 3, Supporting Information (providing reference ranges for the 36 target PFAS chemicals).  The authors noted several possible explanations for a lack of targeted PFAS found in some of the items in which total-F was found: the analyses did not capture fluorinated polymers; the analyses only included a limited number of targeted PFAS' the methods were not optimized for volatile PFAS; it might be possible that there are PFAS present in the products that were not readily extractable but might become more readily mobilize as the products age; and inorganic fluorine might contribute to total F measurements.  Ex. 1 at 6300.

[27] https://www.sierraclub.org/sierra/how-lounge-pfas-free-bras-while-your-partner-puts-kids-less-toxic-clothes-car-seats-strollers (last accessed Nov. 13, 2023) ("Silent Spring found that the products below had known indications of PFAS, ranging from 10 to 3,660 ppm . . . Children's Place pants").

those that were stain or water resistant, including many of its School Uniform items.

76.     Shortly thereafter, On September 21, 2022, scientists at the University of Notre Dame, Indiana University, the University of Toronto, and the Green Science Policy Institute published a report in *Environmental Science and Technology* finding varying levels of PFAS in school uniforms available throughout the United States and Canada.[28]    That research was subsequently widely published via various mainstream media outlets including ABC News, BBC, Consumer Reports, The Guardian, The New York Post, and The Hill.

77.     While Defendant's products were not specifically identified and tested in this study, at a minimum, this study should have put Defendant on notice of the possibility of PFAS in its School Uniform products and alerted it to the need for further testing on its School Uniforms, particularly those that were stain or water resistant.

78.     About 20 percent of U.S. children wear school uniforms,[29] and the prevalence of uniforms in schools "continues to rise in the United States."[30]   School uniforms are especially common and mandated in low-income and elementary schools, as well as in Catholic and other private schools.[31]

79.     The presence of PFAS in school uniforms is particularly concerning, as uniforms are worn directly on the skin for upwards of eight hours per day, five days per week, by children, who are uniquely vulnerable to harmful chemicals.  Due to children's lower body weight and sensitive development, exposure to PFAS at a young age for prolonged periods of time may result in a greater lifetime threat of adverse health outcomes.

---

[28] Ex. 4, Per- and Polyfluoroalkyl Substances in North American School Uniforms, Xia *et. al.*, Environmental *Science & Technology* 2022 56 (19), 13845-13857.
[29] https://nces.ed.gov/fastfacts/display.asp?id=50.
[30] https://www.publicschoolreview.com/blog/uniforms-the-pros-and-cons.
[31] https://nces.ed.gov/fastfacts/display.asp?id=50.

80.   "In general, children experience adverse health outcomes at lower internal concentrations [of PFAS]," stated Jamie DeWitt, PhD, a professor of pharmacology and toxicology at East Carolina University in Greenville, N.C., who studies the health effects of PFAS.[32]

81.   Graham Peaslee, PhD, a professor of physics at Notre Dame and a co-author of the 2022 study published in *Environmental Science and Technology* stated:

> *What was surprising about this group of samples was the high detection frequency of PFAS in the garments required for children to wear . . . Children are a vulnerable population when it comes to chemicals of concern, and nobody knows these textiles are being treated with PFAS and other toxic chemicals."[33]*

82.   Clothing treated with PFAS presents multiple routes for direct exposure and absorption into the human body via skin contact, inhalation, or ingestion.  Young children are especially vulnerable to direct oral exposure due to frequent hand-to-mouth behaviors.

83.   Exposure to PFAS has been associated with numerous negative health outcomes, including increased risk of liver disease and cancer, reduced vaccine effectiveness, endocrine disruption, accelerated puberty, liver and immune system damage, and thyroid changes.

## VI.   Defendant's Misrepresentations and Omissions

84.   Defendant touts the safety of its clothing and its "chemical testing protocols" throughout Annual Environment, Social and Governance (ESG) Reports.  Defendant stated in a 2021 Environmental Safety Group report:

> We have developed chemical testing protocols as part of the quality and safety standards set for all of our products. During the development and production process, our products undergo testing to support compliance with regulatory requirements. This testing helps consumers have confidence that the products they

---

[32] https://www.consumerreports.org/toxic-chemicals-substances/school-uniforms-have-high-levels-of-dangerous-pfas-chemicals-a2854000563/.

[33] https://thehill.com/policy/equilibrium-sustainability/3652756-scientists-find-high-levels-of-forever-chemicals-in-school-uniforms/#:~:text=%E2%80%9CChildren%20are%20a%20vulnerable%20population,noted%2C%20citing%20data%20from%20Statista (emphasis added).

purchase are safe[.]

Utilization of our RSL and regulatory compliance testing help us avoid unwanted substances in finished product . . . . our chemical management goal, announced in 2019, focused on denim and woven bottom vendors based on the risk associated with their production processes. We have been assessing their chemical management systems using data collected annually through the Higg FEM and in FY21 80% of these factories met the goal of achieving the FEM Level 1 sustainability rating for chemicals. Achieving this level means those factories have built the foundation for a responsible chemical management system.[34]

85.     Contrary to representations made by Defendant, certain of the School Uniform items manufactured by Defendant contain PFAS, which is harmful to the human body and the environment, which Defendant failed to disclose.

86.     Defendant knew or should have known of the presence of PFAS in its School Uniforms, and the dangers associated with PFAS, but failed to adequately warn Plaintiffs and the Class Members of the same.

87.     As a direct and proximate result of Defendant's concealment of the presence of PFAS, its deceptive representations, and its failure to sufficiently warn consumers about these chemicals or the harmful consequences of exposure to these chemicals via textiles (particularly as it relates to children) prior to their purchase, Plaintiffs and the Class Members purchased and dressed their minor children in Defendant's School Uniforms, to their detriment.

88.     Plaintiffs and the Class Members purchased Defendant's School Uniforms, certain of which contained PFAS at the point of sale to the public.

89.     Plaintiffs and each of the Class Members have been damaged by Defendant's false, fraudulent, unfair, deceptive, and misleading practices, as set forth fully herein, and seek

---

[34] 2021 ESG Report at p. 33, available at
https://corporate.childrensplace.com/static/esgReport2021-0d2f59dc3c7b8bda361ceaa5a638fd07.pdf.

compensatory damages, injunctive relief, and such other and further relief as this Court deems just and proper.

## CLASS ALLEGATIONS

90.     As detailed below, Plaintiffs bring this lawsuit on behalf of themselves and all others similarly situated, pursuant to Rule 23(a), (b)(2), (b)(3), and/or (c)(4) of the Federal Rules of Civil Procedure.

### I.     Class Definitions

91.      Plaintiffs seek to represent the following Nationwide Class and Subclasses (collectively, the "Classes"):

> **(1)     Nationwide Class: All persons or entities in the United States who, within the applicable limitations period, purchased Defendant's School Uniforms for personal or household use.**

> **(2)     Illinois Subclass: All persons or entities in the state of Illinois who, within the applicable limitations period, purchased Defendant's School Uniforms for personal or household use.**

> **(3)     Florida Subclass: All persons or entities in the state of Florida who, within the applicable limitations period, purchased Defendant's School Uniforms for personal or household use.**

Excluded from the Classes are Defendant and its officers, directors, affiliates, legal representatives, and employees; any governmental entities; and any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff.

92.     Plaintiffs reserve the right to modify or amend the definition of the proposed Classes, or to include additional classes or subclasses, if investigation or discovery indicate that the definitions should be narrowed, expanded, or otherwise modified, before or after the Court determines whether such certification is appropriate as discovery progresses.

## II.    Numerosity

93.    While the exact number of Class Members is presently unknown to Plaintiffs, it likely consists of at least thousands of consumers throughout the United States who purchased Defendant's School Uniforms.  The precise number of Class Members is readily identifiable and can be determined by sales information and other records in the possession of Defendant and its authorized retailers.  Joinder of all members of the class is impracticable given both their volume and geographic diversity.

## III.    Commonality

94.    This action involves common questions of law and fact, which predominate over any questions affecting individual Class Members. These common legal and factual questions include, but are not limited to, the following:

(a)    whether Defendant violated the Illinois Consumer Fraud and Deceptive Business Practices Act;

(b)    whether Defendant violated the Florida Deceptive and Unfair Trade Practices Act;

(c)    whether Defendant omitted or failed to disclose material information to Plaintiffs and Class Members;

(d)    whether Defendant intended that Plaintiffs and Class Members would rely on Defendant's deceptive conduct;

(e)    whether a reasonable person would in fact be misled by Defendant's deceptive conduct;

(f)    whether Defendant knew or should have known of the presence or potential presence of PFAS in their School Uniforms;

(g)    whether Defendant knew or should have known that its omissions of fact concerning the School Uniforms are material and likely to mislead consumers;

(h)    whether Defendant concealed from Plaintiffs and Class Members material facts regarding presence of PFAS chemicals in their School Uniforms;

(i)    whether Defendant intended that Plaintiffs and Class Members would act upon their omissions by deciding to buy the School Uniforms;

(j) whether Defendant provided Plaintiffs and Class Members with implied warranties that the School Uniforms were merchantable and fit for the ordinary purposes for which they were sold;

(k) whether Defendant breached implied warranties because the School Uniforms contain PFAS;

(l) whether Defendant was unjustly enriched at the expense of Plaintiffs and Class Members; and

(m) the type and measure of damages suffered by Plaintiff and Class Members as a result of Defendant's conduct.

**VII.    Predominance**

95.    The questions of law or fact common to Plaintiffs' and each Class Member's claims predominate over any questions of law or fact affecting only individual members of the Classes. All claims by Plaintiffs and the unnamed members of the Classes are based on the common course of conduct by Defendant.

96.    Common issues predominate when, as here, liability can be determined on a class-wide basis, even when there will be some individualized damages determinations.

**IV.    Typicality**

97.    Plaintiffs' claims are typical of the claims of the Class Members because all purchased School Uniforms that were designed, manufactured, marketed, advertised, distributed, and sold by Defendant.  Plaintiffs, like all Class Members, have been damaged by Defendant's misconduct in that, among other things, they each have incurred or will continue to incur damages as a result of overpaying for a product containing PFAS, which makes the product harmful to children's bodies and not fit for its intended use.

98.    Furthermore, the factual basis of Defendant's misconduct is common to all Class Members, because Defendant has engaged in systematic unlawful conduct, resulting in the same injury to all Class Members.  Plaintiffs are advancing the same claims and legal theories on behalf

23

of themselves and all Class Members. Plaintiffs and Class Members have sustained damages from Defendant's common course of unlawful conduct. Further, there are no defenses available to any Defendant that are unique to Plaintiffs.

## V.  Adequacy of Representation

99.     Plaintiffs will fairly and adequately protect the interests of the Members of the Class. Plaintiffs have retained counsel experienced in complex consumer class action litigation, and Plaintiffs intend to prosecute this action vigorously. Plaintiffs have no adverse, conflicting, or antagonistic interests to those of the Classes. Plaintiffs anticipate no difficulty in the management of this litigation as a class action. To prosecute this case, Plaintiffs have chosen the undersigned law firms, which have the financial and legal resources to meet the substantial costs and legal issues associated with this type of consumer class litigation.

## VI.  Injunctive and/or Declaratory Relief

100.    Defendant will continue to commit the unlawful practices alleged herein, and the minor children of Plaintiffs and Class Members will remain at an unreasonable and serious safety risk as a result of wearing the School Uniforms containing harmful PFAS chemicals. Defendant has acted and refused to act on grounds that apply generally to the Class, such that final injunctive relief and corresponding declaratory relief is appropriate respecting the Class as a whole.

## VII.  Superiority

101.    A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Absent a class action, Class Members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law. Because of the relatively small size of Class Members' individual claims, it is likely that few Class Members could afford to seek legal redress for Defendant's misconduct. Absent a class action,

Class Members will continue to incur damages, and Defendant's misconduct will continue without remedy. Class treatment of common questions of law and fact would also be a superior method to multiple individual actions or piecemeal litigation in that class treatment will conserve the resources of the courts and the litigants and will promote consistency and efficiency of adjudication.

102. A class action is superior to individual actions for the proposed Classes, in part because of the non-exhaustive factors listed below:

(a) Joinder of all Class Members would create extreme hardship and inconvenience for the affected customers as they reside worldwide, nationwide, and throughout the state;

(b) Individual claims by Class Members are impracticable because the costs to pursue individual claims exceed the value of what any one Class Member has at stake. As a result, individual Class Members have no interest in prosecuting and controlling separate actions;

(c) There are no known individual Class Members who are interested in individually controlling the prosecution of separate actions;

(d) The interests of justice will be well served by resolving the common disputes of potential Class Members in one forum;

(e) Individual suits would not be cost effective or economically maintainable as individual actions; and

(f) The action is manageable as a class action.

**VIII.    Ascertainability and Nature of Notice to the Proposed Class.**

103. Members of the Class are readily ascertainable and identifiable. Members of the Class may be identified by records maintained by Defendant, its agents, and/or its authorized retailers.

104. Alternative notice will be proposed in the form of traditional internet-based communications and/or notices or advertisements. Plaintiffs contemplate that notice will be

provided to Class Members by e-mail, mail, and published notice.

## COUNT ONE
### Violation of Illinois' Consumer Fraud and Deceptive Business Practices Act
### 85 Ill. Comp. Stat. 505/1-505/12
### (Plaintiff Angala Garland Individually and on behalf of the Illinois Subclass)

105.     Plaintiff Angala Garland repeats and re-alleges the allegations contained in paragraphs 1-104 above, as if fully set forth herein.

106.     Plaintiff brings this Count individually and on behalf of the Illinois subclass.

107.     Plaintiff and the Illinois Subclass Members have standing to pursue a cause of action for violation of the Illinois Consumer Fraud and Deceptive Business Practices Act (the "IFCA"), 815 ILCS 505/1, *et seq.*, because Plaintiff and the Illinois Subclass Members have suffered economic losses as a result of Defendant's actions as set forth herein.

108.     The ICFA prohibits the use of unfair or deceptive business practices in the conduct of trade or commerce.  The ICFA is to be liberally construed to effectuate its purpose.  815 ILCS 505/11a.

109.     Defendant's conduct as described herein violates the ICFA because it violates public policy, it is so oppressive that the consumer has little choice but to submit, and it causes consumers substantial economic injury.

110.     Defendant's conduct, including its failure to disclose that its School Uniforms contain PFAS, constitutes a violation of the act, use and employment of deception, and unfair practices in a course of conduct of trade or commerce.

111.     Defendant intended that Plaintiff and the Illinois Subclass Members would rely on Defendant's deceptive conduct, and a reasonable person would in fact be misled by this deceptive conduct.

112.     Defendant knew or should have known of the presence or potential presence of

26

PFAS in its School Uniforms by at least June 27, 2022 as the result of the scientific literature and media reports described herein, and, upon information and belief, through its own product testing. Thus, Defendant knew or should have known that its School Uniforms were dangerous to children and consumers.

113.    Defendant omitted or concealed material facts about the safety and useable nature of its School Uniforms.

114.    Defendant furthermore knew or should have known that its omissions of fact concerning the School Uniforms are material and likely to mislead consumers.  Under the circumstances that existed, no sales of the School Uniforms should have taken place.

115.    Defendant advertised its products nationally and throughout Illinois, and Plaintiff and each of the Illinois Subclass Members were deceived by Defendant.  Defendant has and continues to advertise and promote its School Uniforms nationally and throughout Illinois.

116.    Like Plaintiff, Members of the Illinois Subclass would not have purchased the School Uniforms had they known that the School Uniforms contained PFAS.

117.    Because of Defendant's unfair and deceptive acts, the School Uniforms purchased by Plaintiff and the Illinois Subclass had diminished or non-existent actual value or resale value because they were contaminated with PFAS and unsafe.

118.    Plaintiff and the Illinois Subclass Members have suffered ascertainable economic losses.

119.    Plaintiff and the Illinois Subclass Members did not receive the benefit of the bargain and are entitled to recover actual damages, attorneys' fees and costs, and all other relief allowed under 815 Ill. Comp. Stat. 505/1, *et. seq*.

120.    Through its deceptive practices, Defendant has improperly obtained and continues

to improperly obtain and retain money from Plaintiff and the Illinois Subclass Members.

121. The damages sustained by Plaintiff and the Illinois Subclass Members could not reasonably have been avoided because they did not know and could not have known that the School Uniforms purchased from Defendant contained PFAS, particularly as there was no warning on the product or in Defendant's advertising.

122. Defendant's omissions in its product labeling and advertising is likely to deceive reasonable consumers because targeted consumers, like Plaintiff and Illinois Subclass Members (*i.e.*, School Uniform consumers), acting reasonably in the circumstances could be misled by said deceptions and omissions.

123. Illinois has a legitimate interest in applying its law to adjudicate this dispute and to ensure companies that do business within the state of Illinois to both resident and nonresident consumers comply with its consumer protection laws. Accordingly, Illinois law has significant contacts to the claims asserted by the National Class so that application of its consumer fraud laws to all class claimants is not arbitrary, capricious, or unfair and is not a violation of due process.

124. Plaintiff, on behalf of herself and the Illinois Subclass Members, seeks relief under 815 ILCS 505/10a, including but not limited to injunctive relief, damages, restitution, punitive damages, and attorneys' fees and costs.

**COUNT TWO**
**Violation of Florida's Deceptive and Unfair Trade Practice Act (FDUPTA)**
**F.S. §§501.201 et seq.**
**(Plaintiff Joelis Saldana Individually and on behalf of the Florida Subclass)**

125. Plaintiff Joelis Saldana repeats and re-alleges the allegations contained in paragraphs 1-124 above, as if fully set forth herein.

126. Plaintiff brings this Count individually and on behalf of the Florida subclass.

127. The Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") renders

28

unlawful unfair methods of competition, unconscionable acts or practice, and unfair or deceptive acts or practices in the conduct of any trade or commerce. § 501.204, Fla. Stat.

128.    Among other purposes, FDUTPA is intended "[t]o protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." § 501.202, Fla. Stat.

129.    Plaintiff and members of the Florida subclass have lost money as a result of Defendant's conduct.

130.    Defendant's actions are deceptive and in clear violation of FDUPTA, entitling Plaintiff and the Florida Subclass to damages and relief under Fla. Stat. §§ 501.201- 213.

131.    Defendant has engaged, and continues to engage, in conduct that is likely to deceive members of the public. This conduct includes failing to disclose the presence of PFAS in its School Uniforms.

132.    This information is important to consumers, including Plaintiff, because PFAS chemicals can cause serious health effects, including cancer, endocrine disruption, accelerated puberty, liver and immune system damage, and thyroid changes in children and adults.

133.    The presence of PFAS in school uniforms is particularly concerning to Plaintiff and consumers, as uniforms are worn directly on the skin for upwards of eight hours per day, five days per week, by children, who are uniquely vulnerable to these harmful chemicals and experience adverse health outcomes at lower internal concentrations of PFAS than adults.  Due to children's lower body weight and sensitive development, exposure to PFAS at a young age for prolonged periods of time may result in a greater lifetime threat of adverse health outcomes.

134.    By committing the acts alleged above, Defendant has engaged in unconscionable,

deceptive, or unfair acts or practices, which constitute unfair competition within the meaning of FDUTPA.

135.    Defendant's conduct is substantially injurious to consumers.  Plaintiff has "lost money or property" as required for standing, and such an injury is not outweighed by any countervailing benefits to consumers or to competition.

136.    Consumers do not know what level of PFAS was detected in the School Uniforms purchased. They do not know any specifics about what type of "testing" was conducted, including by whom.

137.    Because Defendant's misconduct is ongoing and continuing, prospective injunctive relief is necessary.  Absent injunctive relief, Defendant may continue to advertise, promote and sell School Uniforms that are adulterated with PFAS and deceive the public as to their characteristics, contents, and/or safety.  Plaintiff and the Florida Subclass Members are likely to again be wronged in a similar way.  For example, if Plaintiff or the Subclass Members purchase Defendant's School Uniforms in the future and there is a risk those School Uniforms still contain PFAS, Plaintiff or the Subclass Members might mistakenly rely on the School Uniform's advertising or labeling to believe that Defendant eliminated PFAS from the School Uniforms when, in fact, Defendant did not.

138.    Because Plaintiff and the Florida Subclass members reasonably relied on Defendant's labeling and marketing information to disclose what is contained in the Products, and injury resulted from ordinary use of the Products, consumers could not have reasonably avoided such injury.

139.    Florida Statutes, Section 501.204, makes unfair and/or deceptive trade practices in the conduct of any trade or commerce illegal.

140.    Florida Statutes, Section 501.211, creates a private right of action for individuals

who are aggrieved by an unfair and/or deceptive trade practice by another person.

141.    Florida Statutes, Section 501.2105, provides that the prevailing party in litigation arising from a cause of action pursuant to Chapter 501 shall be entitled to recover attorney's fees within the limitations set forth therein from the non-prevailing party.

142.    Florida Statutes, Section 501.213, provides that any remedies available under Chapter 501 are in addition to any other remedies otherwise available for the same conduct under state or local law.

143.    Florida Statutes, Section 501.203 (3)(c), states that a person has violated the FDUTPA if he violates "any law, statute, rule, regulation, or ordinance which proscribes unfair, deceptive, or unconscionable acts or practices."

144.    Defendant is engaged in the practice of manufacturing, marketing, distributing, selling and otherwise placing into the stream of commerce School Uniforms and other children's clothing and textiles, which constitutes trade and commerce as defined by Sections 501.203(8) Fla. Stat., and is therefore subject to FDUPTA.

145.    As a result of Defendant's unfair and deceptive trade practices, Plaintiff and the Florida Subclass members are entitled to an award of attorney's fees pursuant to FDUTPA, Florida Statutes, Section 501.2105, if they prevail.

146.    Wherefore, Plaintiff Joelis Saldana and the Florida Subclass pray for judgment against Defendant, as set forth hereafter. Defendant's conduct with respect to the labeling, advertising, marketing, and sale of its School Uniforms is unfair because Defendant's conduct was immoral, unethical, unscrupulous, or substantially injurious to consumers and the utility of its conduct, if any, does not outweigh the gravity of the harm to its victims.

147.    In accordance with FDUTPA, Plaintiff Joelis Saldana and the Florida Subclass seek

an order enjoining Defendant from continuing to conduct business through fraudulent or unlawful acts and practices and to commence a corrective advertising campaign. Defendant's conduct is ongoing and continuing, such that prospective injunctive relief is necessary.

148.    On behalf of Plaintiff Joelis Saldana and the Florida Subclass, Plaintiff also seeks an order entitling them and the Florida Subclass to recover all monies spent on the Defendant's School Uniforms, which were acquired through acts of fraudulent, unfair, or unlawful competition.

149.    Wherefore, Plaintiff Joelis Saldana and the Florida Subclass are entitled to injunctive and equitable relief, and a full refund in the amount they spent on the Defendant's Products.

**COUNT THREE**
**Fraudulent Concealment**
**<u>(Plaintiffs Individually and on behalf of the Classes)</u>**

150.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1-149 above, as if fully set forth herein.

151.    PFAs are known as "forever chemicals" because they "do not easily break down in the environment and are difficult to destroy."[35]  Exposure to PFAs has been linked with an increased risk of health problems, particularly for children.[36]

152.    Defendant's School Uniforms were treated and/or exposed to PFAS during the manufacturing process, prior to Plaintiffs' purchase and use of the School Uniforms.  Given the dangerous nature of PFAS, Defendant's use of/incorporation of PFAS and the presence of PFAS in its clothing products are material facts about the safety and usability of the School Uniforms.

153.    Defendant concealed from Plaintiffs and Class Members material facts regarding

---

[35] https://www.aaas.org/epi-center/pfas.
[36] https://www.usnews.com/news/health-news/articles/2022-09-21/high-levels-of-pfas-forever-chemicals-in-kids-school-uniforms.

the presence of PFAS chemicals in their School Uniforms.

154.    Defendant had or should have had knowledge of the concealment of such material facts by at least September 21, 2022 as the result of the scientific literature and media reports described herein, and, upon information and belief, through its own product testing.

155.    Plaintiffs and Class Members were unaware of the falsity of the omissions and concealment of material facts made by Defendant.

156.    Defendant concealed such material facts with the intention inducing confidence and driving consumers to purchase the School Uniforms.

157.    Defendant intended that Plaintiffs and Class Members would act upon their omissions by deciding to buy the School Uniforms.

158.    The presence of harmful PFAS in Defendant's School Uniforms is the type of information upon which buyers, like Plaintiffs and Class Members, would be expected to rely upon in making a purchasing decision.

159.    Plaintiffs and Class Members would have acted differently by either not buying the School Uniforms, or paying a reduced purchase price, for the School Uniforms had they known about Defendant's advertising and labeling omissions regarding PFAS.

160.    Defendant' concealment resulted in damage to Plaintiffs and Class Members, including but not limited to the loss of funds expended for School Uniform purchases.

161.    Defendant is therefore liable for Plaintiffs' and Class Members' injuries.

**COUNT FOUR**
**Breach of Implied Warranty**
**(Plaintiff Individually and on behalf of the Classes)**

162.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1-161 above, as if fully set forth herein.

33

163.     Defendant manufactured, marketed, advertised, distributed, and sold the School Uniforms as part of its regular course of business.

164.     Defendant was at all times relevant the manufacturer, distributor, warrantor, and/or seller of the School Uniforms.

165.     Defendant knew or should have known the specific use for which the School Uniforms were purchased, including that the School Uniforms were purchased to be worn by minor children for upwards of eight hours per day, five days per week.

166.     Plaintiffs and the Class Members purchased the School Uniforms directly from Defendant or through authorized retailers.

167.     By placing the School Uniforms into the stream of commerce and selling them to consumers for the purpose of being worn by minor children for upwards of eight hours per day, five days per week, Defendant provided Plaintiffs and Class Members with implied warranties that the School Uniforms were merchantable and fit for the ordinary purposes for which they were sold.

168.     However, the School Uniforms are not fit for their ordinary purpose because certain School Uniforms items contain PFAS, a chemical that is harmful to children and the environment.

169.     The problems associated with the School Uniforms, including increased exposure to toxic PFAS and increased risk of serious adverse health effects, including cancer, endocrine disruption, accelerated puberty, liver and immune system damage, and thyroid changes, prevents the School Uniforms from being safely used for their intended purpose, and thus constitutes a breach of the implied warranty of merchantability.

170.     Defendant failed to adequately warn Plaintiffs and the Class Members of the presence of PFAS and that minor children's wearing of the School Uniforms for upwards of eight hours per day, five days per week, presents a significant level of exposure to toxic chemicals and risk of resulting injury.

171.     The presence of PFAS rendered the School Uniforms unfit for their intended use and purpose and substantially impaired the use and value of the School Uniforms.

172.     As the manufacturer, marketer, advertiser, distributer, and seller of the School Uniforms, Defendant is the only party with knowledge and notice of the fact that the School Uniforms contain harmful chemicals.

173.     That the School Uniforms contained PFAS was not discoverable by Plaintiffs and the Class Members at the time they purchased the School Uniforms.

174.     Defendant impliedly warranted that the School Uniforms were of merchantable quality and fit for such use.  These implied warranties included, among other things: (i) a warranty that School Uniforms manufactured, supplied, distributed, and/or sold by Defendant were safe and reliable for use by children for upwards of eight hours per day, five days per week, and (ii) a warranty that the School Uniforms would be fit for its intended use.

175.     Contrary to the applicable implied warranties, the School Uniforms, at the time of sale and thereafter, were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with safe clothing for their children.  Instead, certain School Uniform items contain harmful chemicals.

176.     Defendant's actions, as complained of herein, breached the implied warranties that the School Uniforms were of merchantable quality and fit for such use.

177.     Defendant's intended beneficiaries of these implied warranties were ultimately Plaintiffs and the Class, not third-party retailers, resellers or distributors who sold the School Uniforms.  Moreover, Defendant exercises substantial control over which outlets can carry and sell its Product, which are the same places that Plaintiffs and Class Members purchased the School Uniforms.  In addition, Defendant's warranties are in no way designed to apply to the third-party retailers, resellers or distributors who purchase the School Uniforms in bulk and then sell them on an individual basis to consumers.  Individual consumers are the ones who ultimately review the labels prior to making any purchasing decisions.  Accordingly, these warranties are specifically

designed to benefit the individual consumers who purchased the School Uniforms.

178.     Plaintiffs and Class Members sustained damages as a direct and proximate result of Defendant's breaches in that they paid a premium for the School Uniforms that they would not have otherwise paid.

179.     Plaintiffs and the Class also did not receive the value of the School Uniforms they paid for—the School Uniforms are worthless or worth far less than Defendant represents due to the presence of PFAS.

180.     Plaintiffs and the Class have sustained, are sustaining, and will sustain damages if Defendant continues to engage in such deceptive, unfair, and unreasonable conduct.

181.     As a result of the breach of the implied warranty of merchantability, Plaintiffs and Class Members are entitled to all damages, in addition to costs, interest and fees, including attorneys' fees, as allowed by law.

## COUNT FIVE
### Unjust Enrichment
### (Plaintiffs Individually and on behalf of the Classes)

182.      Plaintiffs repeat and re-allege the allegations contained in paragraphs 1-181 above, as if fully set forth herein.

183.      Plaintiffs and the Class Members conferred a monetary benefit on Defendant, and Defendant had knowledge of this benefit. The retail price for the School Uniforms listed on Defendant's website are priced at up to $79.99.

184.      By its wrongful acts and omissions described herein, including selling the School Uniforms containing PFAS, Defendant was unjustly enriched at the expense of Plaintiffs and the Class Members.

185.      Plaintiffs and the Class Members' detriment and Defendant's enrichment were related to and flowed from the wrongful conduct alleged herein.

186.     Defendant has profited from its unlawful, unfair, misleading, and deceptive practices at the expense of Plaintiffs and the Class Members under circumstances in which it would

be inequitable for Defendant to retain the profits, benefits, and other compensation obtained from its wrongful conduct as described herein in connection with selling the School Uniforms.

187.    Plaintiffs and the Class Members have been damaged as a direct and proximate result of Defendant's unjust enrichment because they would not have purchased the School Uniforms on the same terms or for the same price had they known that the School Uniforms contained PFAS.

188.    Defendant either knew or should have known that payments rendered by Plaintiffs and the Class Members were given and received with the expectation that the School Uniforms were free of PFAS.  It is inequitable for Defendant to retain the benefit of payments under these circumstances.

189.    Plaintiffs and the Class Members are in privity with Defendant because Defendant directly sold the School Uniforms to Plaintiffs and the Class Members via brick and mortar stores, its official website, and/or its official Amazon storefront.

190.     As a direct and proximate result of Defendant's wrongful conduct and unjust enrichment, Plaintiffs and the Class Members are entitled to restitution of, disgorgement of, and/or imposition of a constructive trust upon all profits, benefits, and other compensation obtained by Defendant for its inequitable and unlawful conduct.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiffs pray for a judgment on behalf of themselves and the Classes:

a.      Certifying the Classes as requested herein;

b.      Awarding actual, direct and compensatory damages;

c.      Awarding punitive damages as appropriate;

d.      Awarding injunctive and/or declaratory relief as appropriate;

e.      Awarding restitution and disgorgement of revenues as appropriate;

f.      Awarding allowable attorneys' fees and costs pursuant to Federal Rule of Civil Procedure 54, or any other applicable provision or principle of law; and

g.    Providing such further relief as may be just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial as to all claims so triable.


Dated: November 14, 2023

Respectfully submitted,

By: */s/ E. Samuel Geisler*
E. Samuel Geisler (IL Bar No. 6305996)
Bryan F. Aylstock, Esq.
D. Nicole Guntner, Esq.
**AYLSTOCK, WITKIN, KREIS & OVERHOLTZ**
sgeisler@awkolaw.com
baylstock@awkolaw.com
nguntner@awkolaw.com
17 East Main Street, Suite 200
Pensacola, FL 32502
Telephone: 850-202-1010
Fax: 850-916-7449


*Counsel for Plaintiffs and the Class*

**BRADLEY/GROMBACHER, LLP**
Marcus J. Bradley, Esq. (174156)
Kiley L. Grombacher, Esq. (245960)
31365 Oak Crest Drive, Suite 240
Westlake Village, California 91361
Telephone: (805) 270-7100
Facsimile:   (805) 270-7589
E-Mail: mbradley@bradleygrombacher.com
kgrombacher@bradleygrombacher.com

*Counsel for Plaintiffs and the Class*